FILED
JUL 07 2010

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. 10-40001 |
| Plaintiff, | |
| vs. | REPORT and RECOMMENDATION |
| KEVIN CLENT HOUSTON, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending is Defendant's Motion to Suppress All Digital and Physical Evidence (Doc.23). A hearing was held on Wednesday, June 9, 2010. Defendant was personally present and represented by his counsel of record, Assistant Federal Public Defender Tim Langely. The Government was represented by Assistant United States Attorney Jeff Clapper. Wisconsin DCI Agent Christine Byars testified at the hearing. Three exhibits were received into evidence. Additionally, both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all of the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be **DENIED**.

## JURISDICTION

Defendant is charged in an Indictment with Possession of Child Pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2256(8)(A). The pending Motion to Suppress was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Schreier's Standing Order dated March 18, 2010.

# FACTUAL BACKGROUND[1]

South Dakota DCI Agent Todd Rodig became aware of an alleged sexual assault of a minor (ESL) when he was contacted by Detective Linda Shawback from Columbia County, Wisconsin in August, 2009. EX 1. The alleged assault occurred in Columbia County, Wisconsin, but the alleged perpetrator (Kevin Houston, the Defendant in this case) resided in Bridgewater, South Dakota. *Id.* In August, 2009, ESL was twelve years old. The alleged assault occurred when ESL was approximately five or six. *Id.* Kevin Houston is ESL's uncle. *Id.*[2]

Detective Shawback's investigation began in May, 2009 when she met with ESL and her mother. ESL had recently received some educational information about sex in a classroom setting at school, and that information prompted her to tell her mother about the assaults which had occurred several years earlier involving her uncle. EX 1, incident report narrative. Additionally, ESL's uncle had recently visited ESL and her family in Wisconsin for Memorial Day Weekend. ESL felt uncomfortable because of the way her uncle was looking at her. *Id.* ESL told her mother during the Memorial Day weekend visit about the assault that had occurred several years earlier. ESL and her mother reported the incident to the Columbia County Sheriff's Department during that Memorial Day weekend, but they were instructed not to confront Houston until law enforcement could first make contact with him. EX 1, incident report narrative.

Later during Detective Shawback's investigation, ESL/her mother sent emails to Houston inquiring about the incident and Houston responded. During these email exchanges, Houston

---

[1] The lone witness who testified during evidentiary hearing testified about a very limited issue regarding the timing of the search of Defendant's computer in Wisconsin pursuant to the Wisconsin state warrant ("warrant #2."). The remainder of the factual background is gleaned from the written material received into evidence as exhibits; namely the affidavits which were provided to the various state court judges in support of the search warrants issued in this case.

[2] For ease of reference, the alleged Wisconsin crime will be referred to as "the assault" although there is some indication more than one incident occurred. (Christmas, possibly Memorial Day and Easter-- family get-togethers at ESL's grandfather's house). EX 1, incident report narrative. For purposes of this Report and Recommendation, however, the objective is not to establish with certainty the specifics of the alleged Wisconsin crime but rather to establish the factual background for the pending federal child pornography charge.

admitted performing oral sex on ESL. Houston asked ESL to delete his email, and to delete it from the deleted folder and the sent folder. EX 1. ESL's mother continued the email dialogue with Houston, posing as ESL and using ESL's email address. Houston responded and indicated he was afraid ESL was working with the police. Nevertheless, in response to the inquiry about what had happened when ESL was five, Houston stated "I asked you to let me see your pussy. You agreed and pulled down your pants and panties. I told you what a pretty pussy you had (it really is;-p) . . . I asked if I could lick and kiss you there. You agreed again and I started licking your slit and kissing/suckling on your clit. As I said, I was trying to stimulate you into orgasm so you could feel how nice it is." Portions of the emails are attached to Shawback's investigative reports and are incorporated into Rodig's affidavit in support of the first South Dakota search warrant ("warrant # 1").

In the course of the investigation, Detective Shawback interviewed ESL's mother. EX 1 incident report narrative. The mother recalled an incident when ESL was five or six years old when ESL told the mother Houston was, while visiting ESL's family in Wisconsin, "looking at naked boys' and girls' butts" on ESL's family computer. *Id.* The mother checked the computer's history function later and observed a website that contained "some pictures of questionable age and sexual contact." EX 1 supplement by Det. Roger Brandner. Detective Brandner's supplement states "[mother] stated that this was the computer that she believed Kevin Houston had used to look at child pornography." *Id.* When Houston's alleged sexual assault of ESL came to light, ESL's mother located the computer in their Wisconsin home and turned it over to Wisconsin authorities. *Id.*

As part of the investigation of the sexual assault case, Detective Shawback met with South Dakota DCI Agent Todd Rodig in South Dakota on August 19, 2009. EX 1. Rodig used the information gathered by Shawback in her Wisconsin investigation to prepare an affidavit in support of a search warrant. EX 1. The warrant authorized law enforcement officers to search Houston's residence in Bridgewater, South Dakota, for property that constitutes evidence of the commission of a criminal offense. The warrant authorized a search of Houston's residence for five categories

3

of property and information. (1) Computers as defined in SDCL 22-22-24.1; (2) documentation regarding computers; (3) data and erased data including emails; (4) financial records regarding computers or internet access; and (5) communications regarding prohibited sexual acts. The Honorable Tim Bjorkman, Circuit Judge for the First Judicial Circuit in McCook County, South Dakota, signed the first warrant on August 19, 2009. EX 1. Detective Shawback traveled to South Dakota for the execution of the search. EX 2, Affidavit ¶ 5. She interviewed Houston during the execution of the warrant. *Id.* Houston admitted exchanging emails with ESL and that his emails contained his version of the incident. *Id.* Houston also commented to Shawback that what law enforcement would find on his computers would be a "prosecutor's dream." *Id.* During the search, law enforcement seized four computer towers, a linksys cable modem, four floppy disks, numerous bags of marijuana, mushrooms, and paraphernalia. *Id.* Detective Shawback transported the seized items back to the Columbia County, Wisconsin Sheriff's Department with her. *Id.*

Upon her return to Wisconsin, Detective Shawback applied for a state search warrant in Columbia County, Wisconsin ("warrant #2). Detective Shawback's affidavit in support of the warrant she sought to search the property (specifically the computers) seized from Houston's Bridgewater, South Dakota home contains in part, the following paragraphs:

> 6. Through affiant's training and experience with computers and investigations, and from discussions with other investigators, affiant is aware that computer processing units can store information in magnetic or optical form on a variety of media including floppy disks and hard drives. This information is stored in the form of files, erased or unerased, or of raw data on the storage media. In addition, traces of how the computer was used and what a user has accessed are left on the storage media of the central processing unit and can be recovered. A hard disk drive can store enormous amounts of information in files and in unallocated portions of the disk that are not identified with any file. Examinations of all files and portions on the hard disk drive is necessary to ensure that all evidence is found because of the ability to hide files and data on the storage media. Computer users can hide information in parts of the hard drive that are not readily apparent but to a trained examiner.
>
> 7. A computer's ability to store, manipulate, and use information make it the perfect tool for keeping notes, letters, email, maps, records and plans. The ability to connect a computer to a network or the Internet make it an efficient and necessary communication and storage device with persons all over the

4

globe.

8. Through affiant's training and experience with computers and investigation, and from discussions with a computer forensics examiner, affiant knows that an examination of a computer storage media can require an examiner to make a duplicate image of the storage media, and this process can take hours or days and can realistically only be performed in a laboratory setting by trained personnel. The time of performing this examination is dependent on a number of factors, including the size of the storage media, the presence of passwords, and the way files and information are stored on the storage media.

9. As a result of the above-mentioned training and experience, I have learned that the following characteristics are generally found to exist in varying combinations and be true in cases involving people who buy, produce, trade, or sell child pornography and who molest children:

   1. There are persons whose sexual objects are children. They receive sexual gratification and satisfaction from actual physical contact with children and from fantasy involving use of pictures, or other photographic or art mediums and writings on or about sexual activity with children.

   2. These people collect sexually explicit materials consisting of photographs, magazines, motion pictures, video tapes, books and slides depicting juveniles which they use for their own sexual gratification and fantasy.

   3. These people usually use sexually explicit materials including those listed above for lowering the inhibitions of children, sexually stimulating children and themselves, and for demonstrating the desired sexual acts before, during and after sexual activity with children.

   4. These people rarely, if ever, dispose of their sexually explicit materials, especially when it is used in the seduction of their victims, and those materials are treated as their prize possessions.

   5. These people often correspond or meet with one another to share information and identities of their victims as a means of gaining status, trust, acceptance and psychological support.

   6. These people rarely destroy correspondence received from other people with similar interests unless they are specifically requested to do so.

7.  The majority of these people prefer contact with children of one sex as well as in a particular age or developmental range peculiar to each individual.

8.  These people engage in activity or gravitate to programs that will be of interest to the type of victims they desire to attract and will provide them to easy access to children.

9.  These people use such photos as described above as a means of reliving fantasies or actual encounters with the depicted children. They also utilize the photos as keepsakes and as a means of gaining acceptance, status, trust and psychological support by exchanging, trading or selling them to other people with similar interests. These photos are carried and kept by these people as a constant threat to the child of blackmail and exposure.

10. The people who are afraid of discovery often maintain and run their own photographic production and reproduction equipment. This may be as simple as the use of "instant" photo equipment as the Polaroid makes, video equipment, or ad complex as a completely outfitted photo lab.

11. These people go to great lengths to conceal and protect from discovery, theft and damage their collections of illicit materials. This often includes the rental or use of safe deposit boxes or other storage facilities outside their immediate residence.

12. These people often collect, read, copy or maintain names, addresses, phone numbers or lists of persons who have similar sexual interests. These may have been collected by personal contact or through advertisements in various publications. These contacts are maintained as a means of personal referral, exchange and commercial profit. These people often correspond with others with the same interests through the use of computerized bulletin boards. The names may be maintained in the original publication, in phone books or notebooks or in computers hard, firm or software or merely on scraps of paper.

13. These people often keep the names of children they are involved with or with home they have had sexual contact with. They maintain these names in such the same manner as descried in the preceding paragraph for much the same

6

reasons.

14. These people maintain diaries of their sexual encounters with children. These accounts of their sexual experiences are used as a means of reliving the encounter when the offender has no children to molest. Such diaries might consist of a notebook, scraps of paper, or a formal diary. Depending upon the resources available to the offender, they may be contained on an audio tape or computer entries into a "home computer."

15. These people cut pictures of children out of magazines, newspapers, books and other publications that they use as a means of fantasy relationships. These "cut-outs" help to identify the age and sexual of the preference (sic) of the person under investigation.

16. These people collect books, magazines, newspapers, and other writings on the subject of sexual activities with children. They maintain these as a way of understanding their own feelings toward children.

17. These people use sexual aids such as dildoes fashioned after a man's penis of various sizes and shapes, in addition to other sexual aids in the seduction of their victims. They often utilize these as a means of exciting their victims and of arousing the curiosity of the children.

18. These people maintain and collect books, magazines, articles and other writings on the subject of sexual activity. These books and materials may be on topics of human sexuality and sexual education or consists of sex manuals discussing or showing various sexual acts, positions or sexual activities. These books and materials are used as a means of seduction of the victim by arousing curiosity, demonstrating the propriety of the acts desired, explaining or demonstrating what the offender desires to be done, and as a means of sexual arousal on the part of the offender, particularly when naked children are shown or depicted in the materials.

19. These people often use drugs as a means of inducement to get a child to a particular location such as the offender's home. Alcohol is also used in this fashion. Both drugs and alcohol are also used as a means of seduction, reducing the child's inhibitions for sexual excitement.

7

20. These people often collect and maintain artifacts, statues, paintings, or other media that depict children or young persons in nude poses or sexual acts. These are kept or "left" in places where the victims can find or "discover" them.

21. These people obtain and keep things of interest to their victims. They may consist of magazines, books, and toys for the age level of the victims they desire to attract and may be as complicated as video games, toy train sets, and computers.

22. These people often keep mementos of their relationship with specific children as a means of remembrance. These may consist of underwear or other garments or things which are unique to the relationship they had with the child.

23. These people obtain, collect, and maintain photographs of the children they are or have been involved with. These photographs may depict children fully clothed, in various stages of undress or total nude, in various activities, not necessarily sexually explicit. These photographs are rarely, if ever, disposed of and are revered with such devotion that they are often kept upon the individual's person in wallets and such. If a picture of a child is taken by such a person depicting a child in the nude, there is a high probability the child was molested before, during or after the photo session because the act of posing is such a great sexual stimulus for the individual.

The Columbia County, Wisconsin Circuit Judge signed warrant #2 on August 24, 2009 at 1:02 p.m. EX 2. The warrant authorized law enforcement to search the computers seized from Houston's Bridgewater, South Dakota home for "which items might constitute evidence of a crime, to wit: first degree sexual assault of a child, contrary to section 948.02(1) of the Wisconsin Statutes and/or possession of child pornography, contrary to § 948.12(1m) of the Wisconsin Statutes."

Detective Shawback contacted Wisconsin DCI Agent Christine Byars for assistance with the forensic examination of Houston's computers. TR 18. Agent Byars traveled from her office in Madison, Wisconsin to the Columbia County Sheriff's office on the afternoon of August 24, 2009 to perform the "preview" of the computers. *Id.* Agent Byars arrived at the office and waited for

Shawback to arrive from the courthouse. TR 19. Agent Byars was escorted upstairs to a conference room, where Shawback eventually arrived with the evidence and a copy of the search warrant. *Id.* The warrant had been signed by the judge at 1:02 p.m. that day, and Agent Byars began her preview at some time after that. TR 20. She had not examined or viewed any of the evidence before the warrant was signed. *Id.* She searched by using keywords looking for emails using the ENCASE software. *Id.* Her initial preview (including a preview for images and movies) indicated the search would take several hours, so she advised Detective Shawback she needed to take the computers back to her lab in Madison to make a "mirror" copy of them overnight. TR 20. During Agent Byars' initial key word and preview search, she observed a few images of child pornography. TR 21. She knew she was going to be taking the computers back to Madison anyway to make the "mirror" images, so she did not export any images at that time. *Id.*

Agent Byars left the Columbia County Sheriff's office with all of the computers that had been seized from Houston's Bridgewater, South Dakota home. TR 21. She started the "mirroring" process right away to allow the process to continue overnight at the lab in Madison, Wisconsin. *Id.* The next day she started on the key word searches first thing, then while that program was running and pursuant to the terms of the search warrant, she continued to look through the drives for child pornography images. TR 22.

A third search warrant was issued for Houston's computers when they were returned to South Dakota. EX3. Agent Rodig applied for the warrant on November 24, 2009, in Yankton County, South Dakota. *Id.* It was issued by a Yankton County Magistrate Judge on November 25, 2009. *Id.* Agent Rodig's affidavit in support of warrant #3 recounted the events which had occurred throughout Detective Shawback's sexual assault investigation in Wisconsin, including the Agent Byars' forensic examination of Houston's computers. EX 3, affidavit in support of search warrant, page 4. Byars informed Agent Rodig that during her forensic examination of Houston's computers, Byars observed 4,923 images she believed to be child pornography. *Id.*

9

Defendant Houston moves to suppress all digital and physical evidence seized under the authority of the warrants because he asserts warrant #1 failed to particularly describe the things to be seized and was therefore invalid on its face pursuant to *Groh v. Ramirez*, 540 U.S. 551 (2004). He asserts, therefore, that everything which flowed from the execution of that warrant is fruit of the poisonous tree. At the time the parties briefed the issue, the defense unaware of warrant #2 (the Wisconsin warrant). During oral argument, however, Defense counsel asserted Detective Shawback's supporting affidavit for warrant #2 did not provide sufficient probable cause to search Houston's computers for anything other than the emails that were exchanged between Houston and ESL in August, 2009. Specifically, the defense asserts Shawback's affidavit in support of the Wisconsin warrant (#2) did not establish probable cause to search Defendant's computers for child pornography.

## DISCUSSION

### Burden of Proof

The, the burden of proof is on the defendant who seeks to suppress evidence. *United States v. Phillips,* 540 F.2d 319 (8th Cir.1976. "A movant seeking to suppress evidence under a regularly issued warrant has the burden to show that the warrant was issued without probable cause." *United States v. Sierra-Garcia,* 760 F.Supp. 252, 262 (E.D.N.Y. 1991) (citations omitted). The standard of proof is a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

1. **The South Dakota Warrant (Warrant #1) Is Supported by Probable Cause and Is Not Over broad[3]**

Defendant's primary argument is that the South Dakota warrant is not supported by probable cause and is over broad. *See* Defendant's Brief (Doc. 25) at p. 10. Defendant cites *Groh v. Ramirez*, 124 S.Ct. 1284, 540 U.S. 551, 157 L.Ed.2d 1068 (2004). In that case, the Supreme Court held the search warrant in question "utterly failed" to describe the persons or things to be seized because the application which did provide the particular description was not incorporated by reference into the warrant itself. *Id.*, 124 S.Ct. at 1289, 540 U.S. at 557. That is not the situation in this case. Instead, Houston asserts the warrant is over broad because it is too inclusive and would theoretically would have allowed the officers to seize and search too much.

The warrant allowed the officers to seize five categories of property. *See* EX 1. Category 1 is "computers" as defined by then-existing South Dakota statute. Category 2 is documentation about the contents or use of the computer. Category 3 is previously erased data and communications including email and correspondence in electronic form.[4] Category 4 is financial records, receipts, lease and licensing information regarding computer systems or internet access. Category 5 is communications in electronic or written form including but not limited to email, chat, and capture files *regarding prohibited sexual acts*. (Emphasis added).

In his affidavit in support of the South Dakota warrant, Agent Rodig explained the circumstances surrounding the alleged sexual assault of ESL several years earlier by her uncle (Houston), and that ESL had recently initiated a conversation via email with Houston about the

---

[3]This discussion is probably academic because it does not appear that any of Houston's computers or other seized property was actually searched pursuant to the South Dakota warrant. Instead, it was seized pursuant to the South Dakota warrant, then released to Wisconsin authorities, where warrant #2 was obtained. The computers were then searched pursuant to the terms of the Wisconsin warrant (warrant #2). Houston concedes probable cause existed to search for evidence of the emails exchanged between himself and ESL. He does not assert that anything outside the scope of probable cause for warrant # 1 was found before warrant #2 was issued in Wisconsin.

[4]Recall Houston instructed ESL to delete the exchanged emails and delete them from the deleted folder and sent folders in her computer.

11

incident. Rodig explained that based on his training and experience, people tend to retain information on their computers for long periods of time, and/or transfer information onto new computers by using floppy disks or CDs. He also explained that in order to appropriately examine computer equipment it is necessary to seize all the computer hardware, software and peripherals so that it may be processed by a specialist offsite. "Such will sometimes be the only way that items such as previously sent and received emails can be effectively recovered from a computer, or files recovered if they are protected via password, encryption, or have been previously 'deleted.' *In light of these concerns, Affiant requests the Court's permission to seize all the computer systems that are believed to potentially contain some or all of the contraband, or instrumentalities described in the warrant, . . .*" (emphasis added).

"The Fourth Amendment requires a search warrant to be based on probable cause, supported by oath, and to describe particularly the place to be searched and items to be seized." *United States v. Gleich*, 397 F.3d 608, 611 (8th Cir. 2005). A common sense approach should be applied in reviewing the issuing judge's decision to grant the warrant application. *Id.* at 612. In *Gleich* the defendant challenged the warrant on particularity grounds, asserting the warrant did not particularly describe which files within the seized computers should be searched. He also asserted the officers exceeded the scope of the warrant by seizing too much (three computers instead of one). The Eighth Circuit held the warrant satisfied the particularity requirement because a common sense reading limited the search to items prohibited by statute. *Id.* at 612. It also rejected the defendant's argument that law enforcement seized too much, because the warrant plainly authorized "the search and seizure of anything within his home which could contain evidence of conduct prohibited by statute." *Id.* at 612. Furthermore, it is "not necessary for an affidavit to include the name of the specific crime alleged." *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007).

There must be a nexus between the contraband and the place to be searched before a warrant may properly issue, but judges are allowed to use common sense and draw reasonable inferences from the totality of the circumstances when deciding whether to issue a warrant. *United States v.*

*Alexander*, 574 F.3d 484, 489 (8th Cir. 2009). The warrant need only be sufficiently definite to enable the searching officers to identify the property to be seized. *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007). "The particularity requirement is a standard of practical accuracy rather than a hypertechnical one." *Id.* (citations omitted, punctuation altered). As a practical matter it is often more intrusive to perform an on-site search of computers and computer data than to seize the necessary materials and analyze it off-site. *Id.* at 1080.

In this case, Houston had several computers and related peripherals, disks, etc. There is no indication law enforcement knew ahead of time which computer Houston used to send the emails to ESL, and there is a strong indication Houston may have deleted the emails from whichever computer he used. Agent Rodig's affidavit and the warrant signed by Judge Bjorkman is viewed with the same commonsense approach applied in *Gleich*. Rodig's affidavit refers to an alleged sexual assault by Houston against a minor (ESL) and emails exchanged between ESL and Houston which reference the assault. A commonsense reading of the warrant leads to the conclusion that it authorizes the search for and seizure of specific property (computers and other digital media) that constitutes evidence of the commission the criminal offense which is discussed in detail in Rodig's affidavit and referred to as a prohibited sexual act (but not specifically cited by statute) in the warrant itself. Pursuant to *Summage* and *Alexander*, the South Dakota warrant (warrant #1) is supported by probable cause and is not over broad.

2. **The Wisconsin Warrant (Warrant #2) Provides Probable Cause to Search for Child Pornography**

Next, Defendant asserts Agent Shawback's affidavit in support of the Wisconsin warrant (warrant #2) is insufficient to support a finding of probable cause to issue warrant #2. Specifically, Houston asserts there is insufficient information contained in Shawback's affidavit to make the connection between his incriminating admissions about sexually assaulting ESL six or seven years in the past and probable cause to believe he possessed child pornography in August, 2009.

A valid search warrant must be based upon a finding by a neutral, detached judicial officer

13

that there is probable cause to believe evidence, instrumentalities, or fruits of a crime, contraband, or a person for whose arrest there is probable cause may be found in the placed to be searched. *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) (citations omitted). "Probable cause is a fair probability that contraband or evidence of a crime will be found in the location searched." *United States v. LaMorie.* 100 F.3d 547, 552 (8th Cir. 1996)(citation omitted). "The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) (citations omitted). Probable cause is a "fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

When the issuing judge relies solely upon the supporting affidavit of the law enforcement officer seeking the warrant, only that information found within the four corners of the affidavit may be considered in determining the existence of probable cause. *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (citations omitted). Whether an affidavit is sufficient to support a probable cause finding to issue a warrant is determined by considering the totality of the circumstances presented. *Illinois v. Gates*, 462 U.S. at 230. Sufficiency of the affidavit is not determined by a piecemeal approach, and the elements of the affidavit should not be read in isolation. *United States v. Sumpter,* 669 F.2d 1215, 1218 (8th Cir. 1982). "Applications and affidavits should be read with common sense and not in a grudging, hyper technical fashion." *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). A probable cause finding may be based upon hearsay from reliable persons, independently corroborated hearsay statements from confidential informants, and observations made by trained law enforcement officers. *Walden v. Carmack*, 156 F.3d at 870 (citations omitted). Once a judge has issued a warrant upon a finding of probable cause, that finding deserves great deference. Therefore, the inherent assumption is that the supporting affidavit is sufficient to provide probable cause is likewise accorded great deference. *Illinois v. Gates,* 462 U.S. at 236; *Walden v. Carmack*, 156 F.3d at 870. "Although in a particular case it may

not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed. 2d 684 (1965)(citation omitted).

In addition to the information contained in paragraphs 6-23 of Detective Shawback's affidavit which are recited in the **FACTUAL BACKGROUND** section of this opinion, Detective Shawback included the following information in her affidavit:

- Detective Shawback had been a law enforcement officer for twelve years. She had assisted in the information gathering, completion and execution of numerous search warrants related to persons involved in sexually assaulting children. Numerous arrests resulted as a result of such search warrants. ¶ 1

- Houston was employed as a computer consultant and EMT. An incident occurred when ESL was five or six, and ESL told her mother she (ESL) had seen Houston looking at naked boys' and girls' butts on the computer. ESL's mother checked the history of the computer later and found websites containing pictures of naked children approximately five or six years old. ¶ 3. Later, when ESL's mother posed as ESL during email exchanges with Houston, Houston remarked that he "got in a lot of trouble" when ESL told her mother about the pictures of naked children on the computer. ¶ 4.

- Houston admitted sending emails to ESL detailing his version of what happened between the two of them. He told Detective Shawback that what law enforcement would find on his computers would be a "prosecutor's dream." ¶5.

- The emails between Houston and ESL include Houston's explanation of what happened, and his statements that "I told you what a pretty pussy you had (it really is ;-p)" and "I was trying to stimulate you into orgasm so you could feel how nice it is . . . Love, Kevin." ¶4.

Although during oral argument Houston cited various legal authority for the proposition that there is not necessarily a correlation between a propensity to molest children and a propensity to possess child pornography, this Court is bound by the law of the Eighth Circuit. "There is an intuitive relationship between acts such as child molestation or enticement and possession of child pornography. Child pornography is in many cases simply an electronic record of child molestation.

15

Computers and internet connections have been characterized elsewhere as tools of the trade for those who sexually prey on children." *United States v. Colbert*, 605 F.3d 573, 578 (8th Cir. 2010).

Houston asserted that *Colbert* is distinguishable from his case and that his case is more like *United States v. Hodson*, 543 F.3d 286 (6th Cir. 2008) and *United States v. Falso*, 544 F.3d 110 (2d Cir. 2008). Both of those courts invalidated warrants authorizing searches for child pornography for lack of probable cause, because the affidavits were based on assertions the defendant was a previously convicted child molester. The *Colbert* Court noted its case was factually inapposite because in *Colbert* the defendant was contemporaneously attempting to entice the child. *Colbert*, 605 F.3d at 577.[5] The *Colbert* court also, however, fundamentally disagreed with *Hodson* and *Falso* to the extent they suggested that evidence of defendant's tendency to sexually abuse or exploit children is irrelevant to the probable cause analysis. *Id.* at 578. Colbert rejected a categorical distinction between possession of child pornography and other types of child exploitation as "in tension both with common experience and a fluid, non-technical conception of probable cause." *Id.*[6] The information contained in Shawback's affidavit is sufficient to lead to the conclusion that there was a fair probability child pornography would be found in Houston's computers in August, 2009.

## CONCLUSION

For the reasons more fully explained above, it is respectfully recommended to the District Court that Defendant's Motion to Suppress All Digital and Physical Evidence (Doc. 23) be **DENIED**.

---

[5]Houston's argument that his case is distinguishable because he was not contemporaneously attempting to entice a child is weakened by his August, 2009 emails to ESL as recounted in Shawback's affidavit. The email language mixes the past tense with the present, "I told you what a pretty pussy you had (it really is ; -p)" explaining that his earlier actions were an effort to bring her to orgasm so she could "feel how nice it is;" "I did what I did because I love you;" "Love, Kevin."

[6]The Court specifically rejected a probable cause analysis "weighed in terms of library analysis by scholars" in favor of one "by those versed in the field of law enforcement." *Id.*

16

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990)

*Nash v. Black,* 781 F.2d 665 (8th Cir. 1986)

Dated this 7 day of July, 2010.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:
JOSEPH HAAS, Clerk

By _____, Deputy

(SEAL)